THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

EMERALD CITY PET RESCUE,

Plaintiff,

v.

LIBERTY MUTUAL INSURANCE, *et al.*,

Defendants.

CASE NO. C24-1843-JCC

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Federal Rule of Civil Procedure 52(a), the Court conducted a bench trial in this insurance garnishment action, where Plaintiff Emerald City Pet Rescue ("ECPR") sought to recover damages and attorney fees from Defendants Liberty Mutual Insurance Company ("LMIC") and Ohio Security Insurance Company ("Ohio"), following ECPR's judgment against Ohio's insured, 360 Plumbing ("360").

Based on the evidence presented, the Court makes the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

1. ECPR purchased Ghost Owl Farm on Vashon Island, intending to use it as an equine rescue facility. (*See, e.g.*, Dkt. No. 66 at 18, 65.) The project required the construction of a large barn to care for and house the horses. (*Id.*)

2. ECPR contracted with Board & Vellum architects to design the barn and Ryan

Construction to build it. (*Id.* at 19.) ECPR separately contracted with 360 Plumbing ("360") to plumb the barn. (*Id.*) ECPR and 360 had no separate written contract or scope of work, which was to be billed on a time and materials basis. (Dkt. No. 68 at 27.)

3. Board & Vellum prepared project specifications, (D. Tr. Ex. A-32), which included the barn's plumbing but excluded a discussion of the adequacy of the existing septic tank. (*See* Dkt. No. 66 at 59.) Although, in so doing, Board & Vellum architects concluded, based on discussions with ECPR representatives, that "[t]here were no issues w/ the [size of] the existing [1,000-gallon septic tank]" based on ECPR's anticipated needs. (D. Tr. Ex. A-20).

4. While testimony on the topic conflicts, it seems 360 was never tasked with (a) advising ECPR on the adequacy of the existing tank's capacity or (b) installing a larger tank (to accommodate the ultimate scale of ECPR's equine operation). (*See, e.g.*, Dkt. No. 66 at 27, 62; 68 at 5, 10.) Nor in fact could 360 do this work, as it was not certified to do so. (*See* Dkt. No. 67 at 40–41.) Rather, the preponderance of the evidence shows that ECPR engaged 360 solely to design and install plumbing *for the barn* and to then tie it into the existing septic tank.

5. The tank proved too small for the equine facility. Thus, once operations began, ECPR encountered frequent backups and overflows. (*See, e.g.*, Dkt. Nos. 66 at 78, 99; 67 at 100.) Ultimately, it had to hire a third party to replace the failing tank with a new 3,000-gallon tank, in a new location. (*See* Dkt. No. 66 at 66; P. Tr. Ex. 29.)

6. Separate from the septic issue was leaks from PEX piping which 360 installed in the barn. At the outset, 360 and ECPR discussed what pipe material to use. While the testimony conflicts, the preponderance of the evidence suggests that ECPR directed 360 to use copper piping throughout, rather than PEX, to mitigate the risk of rodent damage. (*See, e.g.*, Dkt. Nos. 66 at 20, 32, 41, 60, 86; 68 at 44, 45; D. Tr. Ex. A-32 at

29.) Nevertheless, 360 used a mix of PEX and copper throughout. (Dkt. No. 68 at 29, 54.)

7. After operations began, rodents chewed through the PEX in the attic, causing water damage to finished portions of the barn (including cedar planking on the walls and light ceiling fixtures). (*See, e.g.*, Dkt. No. 66 at 31, 82–83, 95; P. Tr. Ex. 13, 14.)

8. As part of the same project, 360 was tasked with installing nine floor drains throughout the barn. Before doing so, it reached out to Ryan General to determine what level the tops should be set. (*See* Dkt. No. 68 at 12.) Joe Poland from Ryan General, informed 360 that the barn floor would not be sloped (towards the drains); rather, ECPR intended to direct any excess water to the drains by squeegee and that the drain tops should be set flush with the level of tiles to be set on top of the concrete floor. (*See* Dkt. Nos. 66 at 173, 183, 184; 68 at 23.) Based on this, 360 set the drain tops at this level.

9. As a result of the design and installation above, water frequently pooled in the barn and did not drain as desired. (*See* Dkt. No. 66 at 81–82.)

10. Besides the barn, 360 was also tasked with laying and burying propane lines and conduit on the farm property (the latter for an electrician to pull electric lines through). (*See, e.g.*, *id.* at 100.)

11. Once the equine facility was operational, ECPR encountered electric service issues. (*See id.* at 101.) It traced the source to a broken segment of conduit line (installed by 360), most likely later inadvertently damaged by heavy equipment which 360 used on the worksite. (*Id.* at 145–46.)

12. Further, in excavating the damaged conduit, ECPR discovered that 360 installed the conduit too close to a propane line also installed on the property. (*Id.* at 188, 189; P. Tr. Ex. 33 at 2.) It was not compliant with building codes. (Dkt. No. 66 at 188.)

13. As the project neared completion, and ECPR expressed its dissatisfaction with 360's

work, communications broke down. (*See, e.g.*, Dkt. No. 66 at 48–49, 96–97.) 360 ostensibly abandoned the project, leaving some items unfinished. (*Id.* at 145.) This included trenching left open and a failure to provide ECPR with final plans and drawings. (*Id.* at 38, 48–49, 100.)

14. Given the issues above, in January 2023, ECPR sued 360 in King County Superior Court for breach of contract, quasi-contract claims, and tort-based claims (Case No. 23-2-00942-8 SEA). (K.C. Record Tab 1)[1]

15. Throughout 360's plumbing work for ECPR, 360 held a general commercial liability policy underwritten by Ohio, (P. Tr. Ex. 43), and issued by LMIC. (*See* Dkt. No. 68 at 32–34) (360 founder Terry Roestel's testimony).

16. Nevertheless, 360 did not initially tender its defense to Ohio. (*See* Dkt. No. 68 at 59–62; D. Tr. Exs. A-23–A-31.) Instead, it first notified Ohio of ECPR's suit (through its insurance agent and via LMIC) in early 2024. (*See* Dkt. No. 68 at 66; D. Tr. Ex. A-21).

17. By then, the King County Superior Court had issued default judgment against 360 in the amount of $116,418.42. (K.C. Record Tab 16.) It was based, in large part, on Jim Cairns' (ECPR's controller's) declaration itemizing ECPR's damages (flowing from 360's errors) as follows:

| Item | Cost |
|---|---|
| Septic system re-design and installation. 360 Plumbing failed to design and install the septic system in a manner that served the Equine Facility. This has led to substantial costs to ECPR in order to design, and eventually install a septic system that will be fully functional. | $74,503.00 |
| Removal of excess dirt and repair of unfinished trenching by 360 Plumbing. | $300.00 |

[1] The case's full record was admitted here as Plaintiff's Exhibit 51. The Court hereafter refers to portions of that record by tab number, *i.e.*, "K.C. Record Tab___," as provided in the parties' joint submission, presented to the Court during the bench trial.

| | |
|---|---|
| Emergency utility location services. Work performed to locate components of the plumbing system due to 360 Plumbing's failure to provide plans and maps of work allegedly performed. | $921.40 |
| Electrical issues caused by 360 Plumbing. Replacement of a control board for the well as a direct result of a wire damage caused by 360 Plumbing. | $2,568.55 |
| Septic system testing/analysis. Because the system was failing, ECPR was forced to hire an inspection team to inspect the existing system, drain field, and other components of the system to determine its adequacy. | $3,913.36 |
| Early septic system pumping and maintenance due to improper design of system. | $1,400 |
| Repair of backflow. ECPR hired Island Pump to analyze and service the East Well controls and to repair the back flow issues caused by 360 Plumbing's improper design and implementation. | $406.27 |
| Installation of backflow prevention controls. ECPR was forced to install a new backflow preventer because the original installation of back flow prevention did not meet code and therefore we were unable to pass our annual inspection. | $152.18 |
| Water sampling. Due to 360 Plumbing's improper design of the septic system, King County requires water sampling to be performed. | $523.41 |
| Repairs by DAC Construction. ECPR was forced to hire a contractor to complete the repairs enumerated below due to 360 Plumbing's failure to properly complete the project.<br>Main Barn Bathroom - Repair water damage from previous leak.<br>Replace/Install lights in Tack Room damaged by water leak.<br>Fill in all exposed trenches left on property.<br>Seal Toilet in Main Barn to Floor. | <br><br><br>$550.00<br>$925.00<br>$2,940.00<br>$105.00 |
| Replace Cedar wall on North side of barn due to water damage.<br>Replace/install high flush toilet for back bathroom | $4,420.00<br>$1,033.00 |
| Estimated cost of repair for improperly designed and installed floor drains. 360 Plumbing installed floor drains above the slope of the floor, rendering the drains useless and prohibiting ECPR from cleaning _the facility in the intended manner. The estimated cost of replacing the concrete slab and properly installing the drains is well in excess of $10,000. | $10,000.00 |
| Estimated cost of repair for improper installation of gas and electrical lines. During inspections, it was discovered that 360 Plumbing laid propane gas lines in the same ditch as the electrical lines, in violation of applicable codes. The estimate cost to remedy this is estimated to exceed $10,000. | $10,000.00 |
| Consulting engineer analysis. ECPR was forced to retain Community Engineering Services, to perform an inspection and assist with determination of additional fixes needed due to 360 Plumbing's improper work. | $1,000.00 |
| Subsurface mapping. Retention of GRS Subsurface to perform subsurface scanning to determine position of piping and plumbing due to 360 Pluming's failure to provide plans and maps. | $757.25 |
| **Total** | **$116,418.42** |

(K.C. Record Tab 14.)

18. The King County Superior Court, at ECPR's request, later issued an order of contempt against 360. (K.C. Record Tab 36.) ECPR also sought a bench warrant against 360's principals. (*Id.* at Tab 38.)

19. With this, 360 finally tendered its defense to Ohio and/or LMIC, who notified 360 they would do so under a reservation of rights.[2] (*See* Dkt. No. 68 at 66; D. Tr. Ex. A-21, 22.)

20. Defendants retained counsel on 360's behalf. (D. Tr. Ex. A-22.) They first retained attorney Kirsten Schultz, (*see* Dkt. No. 68 at 48; D. Tr. Ex. A-22), who appeared on February 5, 2024, but inexplicably made no filings and took no apparent action. (Dkt. No. 68 at 74.)

21. Attorney Anne Cohen substituted for her some six weeks later, (K.C. Record Tab 42), and lodged a response opposing the bench warrant shortly thereafter. (*Id.* at Tab 45.)

22. Ms. Cohen later moved to set aside the default judgment. (*Id.* at Tab 53.)

23. The King County Superior Court denied Ms. Cohen's motion, after finding that 360 "failed to act with diligence" in so moving. (*See* Dkt. No. 68 at 58–81; K.C. Record Tab 67.)

24. With this, Ms. Cohen "closed the file" and took no further action. (*See* Dkt. No. 68 at 80.)

25. ECPR now had a judgment against 360 in hand but could not collect, as 360 had ceased operations and had no assets to satisfy the judgment, other than Ohio's policy. (*See* Dkt. No. 68 at 26.)

26. In response, ECPR brought this garnishment action, which Defendants removed to

[2] In so notifying 360, Defendants noted that the policy only applies to damage from an "occurrence" and that it further contains "conditions" and "exclusions." (D. Tr. Ex. A- 22.)

this Court. (*See* Dkt. Nos. 1, 1-1.)

27. The policy, which ECPR seeks to garnish, includes the following conditions and exclusions at issue in this matter:

    a. Section IV.2 (duties in the event of an occurrence) provides that the insured must "see to it that we are notified as soon as practicable" in event of an occurrence "which may result in a claim" and if a suit is brought against the insured, it must "[i]mmediately record the specifics" and "[n]otify us as soon as practicable." (P. Tr. Ex. 43 at p. 20, 31.)

    b. Section I.2 (exclusions) precludes coverage as follows:

        i. j.(5) "That particular part of real property on which you . . . are performing operations if the 'property damage' arises out of those operations. (*Id.* at p. 13.)

        ii. j.(6) "That particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it" provided that the damage is not included in the "products-completed operations hazard," which includes "[w]ork that has not yet been completed." (*Id.* at p. 13, 24.) Meaning, this exclusion is inapplicable once the work is complete, if an occurrence arises out of (or as a result of) that completed work.

28. Following motion practice, (*see* Dkt. Nos. 28, 50), the Court held a three-day bench trial, (*see* Dkt. Nos. 59–61). In so doing, it took testimony, (*see* Dkt. No. 52-1[3], 52-2, 62), and admitted trial exhibits, (*see* Dkt. No. 63).

29. The parties then submitted proposed findings and conclusions, along with final

---

[3] Prior to trial, the parties proposed deposition designations for witnesses Lou Kings and Amanda Bowser. (*See* Dkt. No. 52.) The Court admitted only designations for Mr. Kings (who was unavailable at trial), subject to objections to be lodged post-trial. (*See* Dkt. Nos. 66 at 6, 67 at 3.) No such objections were lodged.

argument (in written form). (*See* Dkt. Nos. 69, 70, 71.)

## II. CONCLUSIONS OF LAW

**Garnishment Actions – In General**

1. When seeking to establish a garnishment in accordance with RCW 6.27 *et seq*., ECPR bears the burden to prove the following: (1) it holds a valid judgment against the insured, (2) the judgment is based on a covered event, and (3) the insurer is liable for the event pursuant to the policy. *See Est. of Felipe Vargas v. St. Paul Fire & Marine Ins. Co.*, 2016 WL 410061, slip op. at 5 (W.D. Wash. 2016), *aff'd sub nom.* 717 F. App'x 697 (9th Cir. 2017) (citing *Weyerhaeuser Co. v. Calloway Ross, Inc.*, 137 P.3d 879, 881 (Wash. Ct. App. 2006).
2. Because LMIC did not underwrite 360's policy, it cannot be liable here.
3. It is undisputed that ECPR holds a valid judgment against 360, Ohio's insured. At issue, then, is solely whether ECPR's King County Superior Court judgment against 360 is for a covered event.

**Coverage – In General**

4. ECPR has the burden of proving that the policy covers the loss at issue, whereas, to avoid coverage, Ohio must then point to specific policy language (either conditions or exclusions) precluding coverage.[4] *Mut. of Enumclaw Ins. Co. v. T & G Const., Inc.*, 199 P.3d 376, 383 (2008).
5. As the Court previously discussed, (*see* Dkt. No. 28 at 6–7), coverage for "property damage" does not extend to the prevention of future damage. *See Boeing Co. v. Aetna*

[4] "Interpretation of the terms of an insurance policy is a matter of law." *Allstate Ins. Co. v. Raynor*, 21 P.3d 707, 711 (Wash. 2001). The Court interprets undefined terms in policy language as they would be read by an ordinary insurance consumer. *See Moeller v. Farmers Ins. Co. of Wash.*, 267 P.3d 998, 1002 (Wash. 2011). Inclusionary clauses must "be liberally construed to provide coverage." *Riley v. Viking Ins. Co. of Wisconsin*, 733 P.2d 556, 558 (Wash. Ct. App. 1987). "Exclusionary clauses should be construed against the insurer with special strictness." *McAllister v. Agora Syndicate, Inc.*, 11 P.3d 859, 860 (Wash. Ct. App. 2000).

*Cas. and Sur. Co.*, 784 P.2d 507, 515 (Wash. 1990) ("preventive measures taken before pollution has occurred are not costs incurred because of property damage"); *see, e.g.*, *Wampold v. Safeco Ins. Co. of Am.*, 409 F. Supp. 3d 962, 970 (W.D. Wash. 2019), *aff'd*, 820 F. App'x 598 (9th Cir. 2020) (costs to avoid future slides are not "property damage"). Thus, to the extent ECPR's costs relate to prevention efforts, they do not trigger coverage under the policy.

A. <u>Failing Septic Tank</u>

6. Property damage relating to septic tank performance is not an "occurrence" under the policy because it is not an "unusual, unexpected, and unforeseen happening." *Grange Ins. Co. v. Brosseau*, 776 P.2d 123, 125 (1989). The tank was too small for the equine operation (which is not unforeseen) and, regardless, 360 was not engaged to assess its size or adequacy. "[O]verusage . . . for what the system is designed for" triggered the need for frequent pump outs to avoid overflows (which ECPR elected not to do). (Dkt. No. 66 at 155). Not an affirmative act (or failure to act) by 360.

7. Further, it is ECPR's burden to prove what portion of the amounts it spent to replace the septic tank was to ameliorate current harms (versus prevent future ones). It also failed to present clear evidence on this issue. Of note, Mr. Jewett's testimony on the topic, (*see* Dkt. No. 67 at 66–111), was not helpful.

8. Accordingly, ECPR has not established that the following expenses are included within 360's coverage: septic re-design and installation $74,503; septic testing and analysis $3,913.36; septic pumping $1,400; and water sampling $523.41.

B. <u>Floor Drains</u>

9. The $10,000 in estimated cost to remove and replace (*i.e.*, lower) the floor drains to allow for better drainage is also not an "occurrence." Largely unrebutted testimony shows 360 placed the drains at the height it was instructed to do and, regardless, drainage issues associated with the barn primarily stem from *inadequate floor sloping*

(which 360 did not do). The estimated costs to redo the drains is not recoverable.

C. Completing Other Work

10. ECPR presented no evidence that the backflow issues; open trenches; lack of plumbing maps, drawings or plans/specifications would, in any way, ameliorate current harms. Rather, amounts ECPR spent here were primarily to provide future benefits to ECPR. Thus, the following amounts are not recoverable: repair unfinished trenching $300 & $2,940; emergency location services $921.40; backflow repair $406.27; backflow installation $152.18; remove/replace non-compliant gas and electric lines $10,000; consulting engineer $1,000; subsurface mapping $757.25; sealing the toilet in the main barn (to the floor) $105; and replacing high flush toilet in back bathroom $1,033.

**Late Tender**

11. As the Court previously indicated, (*see* Dkt. No. 28 at 4), an insurer has no duty to defend or indemnify until tender is made. *Natl. Sur. Corp. v. Immunex Corp.*, 297 P.3d 688, 696 (Wash. 2013). The rule can absolve an insurer of its duty to defend or indemnify the insured. *Id.* But this requires a showing of "*actual and substantial prejudice* from [the] late notice." *Id.* (emphasis in original). Said another way, "an insurer must perform under the insurance contract even where an insured breaches the timely notice provision of the contract unless the insurer can show actual and substantial prejudice due to the late notice." *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 191 P.3d 866, 871 (Wash. 2008).

12. Defendants presented evidence, through the testimony of Anne Cohen, along with exhibits relating to the King County Superior Court proceeding, that the tender here was, in fact, late. Waiting until default judgment and a contempt order is issued would not qualify as notification "as soon as practicable," as required under the policy. At issue, though, is that none of the exhibits nor Ms. Cohen's testimony spoke

in *specific terms* of the prejudice Defendants incurred from this late tender. No doubt, the Court could speculate what that might be, but Defendants' evidence on the issue was insufficient to carry their burden. Thus, the Court FINDS that, while 360 violated the policy's the notice, evidence of resulting harm is insufficient to trigger the late tender rule.

**Policy Exclusions**

13. The remaining harms offered by ECPR, for which there was an "occurrence" resulting in coverage (absent the application of policy exclusions) are as follows:
    a. $2,568.55 to replace electrical equipment damaged from a break in the conduit;
    b. $550 to repair water damage in main barn bathroom from prior leak;
    c. $925 to replace lights in tack room damaged by pipe leak; and
    d. $4,420 to replace cedar wall in barn damaged by pipe leak.
14. All of these harms arose after 360 completed its work (whether that be laying the conduit or installing PEX rather than copper) which were then caused by an unforeseen accident, *i.e.*, an occurrence (such as 360 breaking the conduit with heavy equipment or rodents chewing through the PEX).
15. None are subject to faulty workmanship exclusions j.(5) or j.(6)[5] because the occurrence did not arise out of 360's operations nor was it simply because 360 incorrectly performed work on the property. They were caused by an after-the-fact occurrence.

**Recoverable Damages**

16. The total recoverable damages (*i.e.*, those subject to coverage under 360's policy and not excluded through the policy) is $8,463 (2,568.55 + 550 + 925 + 4,420). The Court will enter judgment in this amount along with interest in accordance with RCW

[5] Although the Court notes that, had it found that the septic system, backflow prevention, non-compliant gas and conduit line placement, and drain replacement costs were covered by the policy (again they are not), exclusions j.(5) and/or j.(6) undoubtedly would have applied.

6.27.090.

**Attorney Fees**

17. RCW 6.27.230 provides for the recovery of prevailing party costs and attorney fees in a controverted garnishment (such as this one). In this instance, though, neither party fully prevailed. **Thus, the Court seeks supplemental briefing as to the measure of prevailing party costs and fees**. Briefs from each party are due no later than 21 days from the date of this order and shall contain no more than 10 pages of argument.

It is so ORDERED this 2nd day of September 2026.

John C. Coughenour
UNITED STATES DISTRICT JUDGE